UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES E. HOWELL,

            Plaintiff,

v.

KEVIN D. CORNING, *et al.*,

            Defendants.

_____/

Case No. 1:13-cv-1276

Hon. Robert J. Jonker

## REPORT AND RECOMMENDATION

This is a *pro se* civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983.  Plaintiff's complaint is directed at four defendants, R.N. Kevin Corning, Dr. Richard Czop, Dr. Gail Burke and Corizon Health, Inc. ("Corizon") with respect to his medical treatment while incarcerated by the Michigan Department of Corrections (MDOC) at the Bellamy Creek Correctional Facility (IBC). This matter is now before the Court on motions for summary judgment filed by defendant R.N. Corning (docket no. 14), and defendants Dr. Czop, Dr. Burke and Corizon (docket no. 21).

### I.      Plaintiff's complaint

Plaintiff's complaint includes the following allegations.  On January 13, 2009, prior to his incarceration, plaintiff had surgery on his "shoulder."  Compl. at ¶ 6 (docket no. 1).  The next day, he fell and injured his left shoulder.  *Id.* A doctor in the "free world" ordered "a second surgery to repair the damage" which was scheduled for June 10, 2009.  *Id.* at ¶¶ 6-7.  Plaintiff identified the latter surgery as "rotator cuff CPT 29827 and CPT 29526 arthroscopy." *Id.* at ¶ 7.  Plaintiff did

not receive the second surgery because he committed armed robbery and was incarcerated.  *Id.* at ¶ 7.[1]

Plaintiff wrote health care kites on March 3, 2010, October 17, 2010 and "[o]n several different occasions" requesting  to see a doctor for the pain in his left shoulder.  *Id.* at ¶¶ 9-10.  Plaintiff makes no allegations regarding his medical treatment for approximately six months after writing this kite.  Then, on April 6, 2011, plaintiff wrote a grievance against R.N. Corning for "medically diagnosing [plaintiff's] condition and refusing to schedule him to see a doctor concerning his pain."  *Id.* at ¶ 11.

Plaintiff makes no allegations regarding his medical condition for two months after filing his grievance.  Then, plaintiff wrote a series of healthcare kites during the summer of 2011 dated June 6th, June 21st, June 27th, July 6th and July 13th.  *Id.* at ¶¶ 12-16.  In response to these kites, R.N. Corning advised plaintiff: that medications were available at the prison store to help with his discomfort; that he had been seen by the doctor; that his x-rays were normal; and that plaintiff had been advised "not to go to rec or the weight pit."  *Id.*

On July 20, 2011, either Dr. Burke or non-party Dr. Holmes gave plaintiff a shoulder injection.  *Id.* at ¶ 17.  Two days later, plaintiff wrote a grievance stating that he was still having severe pain.  *Id.* at ¶ 18.  On July 28, 2011, plaintiff sent a healthcare kite complaining of a swollen shoulder, asking to see a someone other than Dr. Burke, and questioning the diagnostic test used (i.e., an x-ray).  *Id.* at ¶ 19.  R.N. Corning responded: that Dr. Burke saw plaintiff the previous week; that the doctor noted "a little osteoarthritis in that shoulder;" that the doctor would request a consult

---

[1] According to the MDOC's Offender Tracking Information System (OTIS), plaintiff committed armed robbery on March 20, 2009 and was sentenced on January 26, 2010. *See* Biographical Information at http://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=750996.

with the Pain Management Committee (PMC); and that because plaintiff's base problem was arthritis, he should take aspirin, naproxen or ibuprofen for his discomfort. *Id.* On July 29, 2011, plaintiff sent a letter to the Bureau of Health Care Services complaining that his left shoulder pain was not being appropriately treated. *Id.* at ¶ 20.

On August 4, 2011, plaintiff sent another healthcare kite in which he disagreed with the medical diagnosis, stating that he did not have arthritis, that he had nerve damage, that his shoulder was swollen and that he had a lot of pain. *Id.* at ¶ 21. R.N. Corning responded that Dr. Burke found no problems with plaintiff's left shoulder that would be treated surgically. *Id.*

On August 9, 2011, plaintiff sent a healthcare kite complaining of pain in the shoulder. *Id.* at ¶ 22. On August 23, plaintiff sent another kite stating that his arm and hand were "constantly numb" and that his shoulder and fingers were "very swollen." *Id.* at ¶ 23. R.N. Corning did not respond to the latter kite. *Id.*

On August 30, 2011, plaintiff sent another kite stating that he wanted to be seen as soon as possible by the doctors. *Id.* at ¶ 24. Dr. Burke saw plaintiff two days later, and told him, "There's nothing I can do, your [sic] not getting no [sic] help and surgery is out of the question." *Id.* at ¶ 25. That same day, plaintiff wrote a grievance against Dr. Burke, "Prison Health Service" and R.N. Corning advising of his "Notice of intent to sue because his pain in his shoulder has not been properly addressed." *Id.* at ¶ 26.

On September 22, 2011, plaintiff sent a health care kit requesting physical therapy. *Id.* at ¶ 27. At some point in October, plaintiff was placed on nortriptyline (an anti-depressant) . *Id.* at ¶ 28.[2] On December 30, 2011 plaintiff sent a kite stating that he had been on nortriptyline for

---

[2] Plaintiff sometimes refers to this medication as "nortripline."

60 days and it did nothing but cause a headache and complaining that his numbness and pain was not arthritis. *Id.*

On January 5, 2012, plaintiff saw Dr. Burke who advised him that there was nothing she could do for him and that "you better learn how to deal with the pain your [sic] having." *Id.* at ¶ 29. Three days later, plaintiff wrote a grievance against Dr. Burke complaining that his pain had not been properly addressed and that she should "consider the grievance as a Notice of Intent to sue." *Id.* at ¶ 30.

On February 2, 2012, plaintiff sent a health care kite asking to consult with a specialist (orthopedic surgeon). *Id.* at ¶ 31. R.N. Corning advised plaintiff that the policy allowed plaintiff to see any doctor provided that plaintiff covered the cost. *Id.* On February 15, 2012, plaintiff sent another health care kite asking for the cost of seeing another doctor. *Id.* at ¶ 32.

Plaintiff makes no allegations regarding his condition for the next three months. On May 20, 2012, plaintiff sent a health care kite complaining about shoulder pain. *Id.* at ¶ 34. Two days later, plaintiff saw Dr. Burke who told plaintiff that he "needed to stop bothering healthcare about his shoulder [sic] there was nothing that healthcare could do." *Id.* at ¶ 35. The next day (May 23, 2012) plaintiff sent a health care kite requesting the address for the PMC. *Id.* at ¶ 36.

On June 25, 2012, plaintiff sent a health care kite complaining of shoulder and arm pain and also filed a grievance complaining of deliberate indifference to his medical condition. *Id.* at ¶¶ 37-38. On June 26, 2012, plaintiff wrote a health care kite "requesting the date his nortiptyline was discontinued." *Id.* at ¶ 39. On June 28, 2012, plaintiff wrote another grievance complaining that the MDOC's treatment plan was not helping relieve his left shoulder pain and complaining that his nortriptyline was discontinued on June 18th "without me seeing anyone." *Id.* at ¶ 40.

On July 12, 2012, Dr. Burke saw plaintiff who told him that he was wasting her time and "that there is nothing I can do for you." *Id.* at ¶ 41.  On July 27, 2012, plaintiff sent another health care kite "requesting to know why he was having shoulder pain." *Id.* at ¶ 42.

While incarcerated, plaintiff had been in contact with Stephanie Garbarino from the American Friends Service Committee. *Id.* at ¶¶ 33, 43.  On August 6, 2012, Garbarino sent an e-mail to the Bureau of Health Care Service stating that she had performed research on "rotator cuff and other shoulder tendon injuries, and found that normal x-rays cannot rule out a torn or damaged rotator cuff" and wanted to know "why has a doctor not ordered an MRI for Mr. Howell?" *Id.* at ¶ 43.

Plaintiff made no allegations regarding his condition for approximately seven months, other than stating that he sent a health care kite complaining of left shoulder pain on October 23, 2012. *Id.* at ¶ 44. Then, on March 5, 2013, plaintiff he saw non-party P.A. Huyge ,who noted that plaintiff was becoming increasingly agitated and wanted surgery on his shoulder. *Id.* at ¶ 45.  One month later, on April 5, 2013, plaintiff sent a health care kite "seeking to have an MRI taken." *Id.* at ¶ 46.

On May 1, 2013 plaintiff sent a health care kite stating that his left shoulder was aggravated and needed to see the doctor "A.S.A.P." *Id.* at ¶ 47.  On May 14, 2013, Dr. Czop saw plaintiff. *Id.* at ¶ 48.  At that time, Dr. Czop noted that plaintiff was "aware that surgery for this situation is not a treatment option in prison." *Id.*   Dr. Czop also informed plaintiff that he would be wasting time trying to get the doctor to do something about his shoulder pain. *Id.*  Two days later, plaintiff wrote a grievance against Dr. Czop. *Id.* at ¶ 49.

Approximately two months later, on July 18, 2013, corrections officers escorted plaintiff to health care after he told the officers he had suicidal thoughts about his shoulder pain. *Id.* at ¶ 50.   On August 16, 2013, non-party Nurse Melissa Lorentz saw plaintiff and stated that she could "only give emotional support" regarding plaintiff's left shoulder pain.   *Id.* at ¶ 51.

Then, on October 25, 2013, more than two months after seeing Nurse Lorentz, plaintiff filed a grievance against "Corizon [sic] formerly known as Prison Health Services."  *Id.* at ¶ 52.   Based on these facts, plaintiff contends that defendants violated his rights under the Eighth Amendment, the Michigan Constitution of 1963, and M.C.L. § 691.1407 (i.e. gross negligence).  *Id.* at ¶¶ 54-61.   Plaintiff seeks compensatory and punitive damages.   *Id.* at p. ID# 10.

## II.    Defendants' motions for summary judgment

### A.    Legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

6

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Finally, plaintiff filed no response to the motion for summary judgment filed by defendants Dr. Czop, Dr. Burke and Corizon.[3] "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). The trial court is required to "intelligently and carefully review the legitimacy of such unresponded-to motion" and cannot "blithely accept the conclusions argued in the motion." *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 407 (6th Cir. 1992). However, when a motion for summary judgment is unopposed, "[n]othing in either the Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record" to demonstrate the existence of genuine issues of material fact. *Id.* at 405.

---

[3] Plaintiff's claim that he was unable to file a response to their motion is addressed in a separate order.

### B.     R.N. Corning

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws.   *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984);  *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996).  To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97 (l976).   A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind.  *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).  The objective component requires the infliction of serious pain or failure to treat a serious medical condition.   *Id.* at 8-9.  "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.*  at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety.  *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991).  To establish the subjective component, the plaintiff must show that "the official knows of and disregards an

8

excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation.  *Id.* at 835.  "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."  *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

Plaintiff alleged that R.N. Corning violated his Eighth Amendment rights when Corning: "a) failed to schedule or place Plaintiff on the callout to be evaluated; b) medically diagnosed Plaintiff [sic] condition without a doctor supervision [sic] and in direct violation of the Michigan Constitution of 1963; c) by disregarding Plaintiff's pain and upon belief and knowledge refused to schedule Plaintiff to see a doctor[.]"  Compl. at ¶ 55.

As an initial matter, the allegations in plaintiff's complaint indicates that he received treatment for his left shoulder pain on numerous occasions.  R.N. Corning has submitted the following medical records which relate to his interaction with plaintiff.  On June 9, 2011, R.N. Corning advised plaintiff that there were several medications available to help with his complaints of back and shoulder pain.  *See* Kite Response (docket no. 30 at p. ID# 399).  On June 13, 2011, R.N. Corning examined plaintiff for a burning in the shoulder.  *Id.* at p. ID# 401.  Corning noted that plaintiff had shoulder surgery in January 2009, that plaintiff's left hand grasp was weak when compared with his right hand, and that when plaintiff moved his shoulder, Corning felt "clicking in the shoulder."  *Id.*  That same day, non-party P.A. Behler examined plaintiff and ordered an x-ray of plaintiff's left shoulder.  *Id.* at pp. ID## 403-05.  The x-ray taken on June 14th showed previous surgical intervention, with no evidence of an acute displaced fracture or other acute osseous

abnormalities. *Id.* at p. ID# 400. On June 21, 2011, plaintiff sent a kite stating that "will open my shoulder don't make me cut myself" if he did not see someone. *Id.* at p. ID# 406. Non-party R.N. Johnson advised plaintiff that this was not an emergency and advised against plaintiff participating in call outs for the gym and weight pit. *Id.* at p. ID# 408. The next day, R.N. Corning responded to a kite regarding shoulder pain, reviewed plaintiff's negative test result and recent doctor visit, reminded plaintiff that he was not to go "to rec or the weight pit," and to obtain meds from the prison store. *Id.* at p. ID# 409.

On July 20, 2011, R.N. Corning responded to a kite in which plaintiff stated that he saw Dr. Burke on July 20th, that the doctor told plaintiff he would no longer be getting Elavil, and plaintiff wanted to see Dr. Burke or Dr. Holes as soon as possible about his shoulder. *Id.* at p. ID# 415. R.N. Corning responded that Elavil was no longer formulary, that to receive it plaintiff needs to be evaluated by the Pain Management Committee (PMC) and that Dr. Burke planned to submit a request to the PMC for evaluation. *Id.* R.N. Corning also commented that plaintiff had been evaluated several times for his shoulder problem and that this was a chronic problem. *Id.* On July 31, 2011, R.N. Corning responded to plaintiff's July 28th kite regarding his painful and swollen left shoulder. *Id.* at p. ID# 416. R.N. Corning noted that Dr. Burke found a little osteoarthritis in the shoulder, that the doctor would request a consult with the PMC and that aspirin, naproxen or ibuprofen would help with the arthritis. *Id.*

On August 8, 2011, R.N. Corning responded to a kite in which plaintiff disputed that he had arthritis, stated that he had nerve damage and needed a pain medication to replace his Elavil. *Id.* at p. ID# 428. Corning notes that according to the doctor, plaintiff has arthritis in the left shoulder, that there is a new order for Elavil 100 mg every night, that Dr. Burke's recent

10

examination found no problems with plaintiff's left shoulder that would be treated surgically.  *Id.*

On August 15, 2011, R.N. Corning responded to plaintiff's kite in which plaintiff stated that he had pain in the shoulder because "I have a cervical rib which is pinching a nerve." *Id.* at p. ID# 421.  Plaintiff stated that everyone overlooked this problem and that just because the x-rays show nothing, that does not mean there is nothing wrong.  *Id.*  Corning stated that x-rays show bones, some organs and tissues, and that the less dense the structure the less it shows on the x-ray. *Id.*  Corning further stated, "Your pain has not been ignored; you have been seen and evaluated and started on something for the pain." *Id.*

In response to plaintiff's kite that his shoulder and fingers were very swollen and that his arm and hand constantly numb, R.N. Corning scheduled plaintiff for a nurse sick call on August 29, 2011.  *Id.* at p. ID# 423.  Records reflect that plaintiff was seen by non-party R.N. Karen Rosa on August 26, 2011.  *Id.* at pp. ID## 425-26.

The record reflects that R.N. Corning responded to plaintiff's kites, advised plaintiff of the doctor's diagnoses, scheduled nurse visits when necessary, reminded plaintiff to stop participating in activities that negatively affected his shoulder pain (i.e., using the weight pit), and suggested the types of over the counter pain medication that could alleviate plaintiff's arthritis. Nothing in this record suggests that R.N. Corning was deliberately indifferent to plaintiff's serious medical condition.  On the contrary, R.N. Corning responded to plaintiff's complaints in his capacity as a nurse.  In this regard, per MDOC policy, Corning was not involved in medical decisions concerning plaintiff's course of treatment, with such decisions being the sole responsibility of other medical care providers.  *See* Corning Aff. (docket no. 15-5); MDOC Policy Directive 03.04.100 ¶

K (providing in pertinent part that "all medical, psychiatric, and dental matters involving medical judgment are the sole province of the responsible physician, psychiatrist, or dentist") (docket no. 15-3 at p. ID# 70).  Accordingly, R.N. Corning's motion for summary judgment should be granted with respect to plaintiff's Eight Amendment claim.

### C.   Corizon

Plaintiff claims that defendant Corizon (sometimes referred to as "Prison Health Service") violated his Eighth Amendment rights.  First, plaintiff alleged that Corizon violated his Eighth Amendment rights by demonstrating a "substantial lack of concern for the intense pain they caused Plaintiff by denying him the necessary treatment to control the intense pain," which included the failure to order an MRI.  Compl. at ¶ 59.   By making this claim, plaintiff seeks to hold Corizon liable under a theory of vicarious liability for the acts of the individual doctors, nurses, and physicians assistants who provided medical services at the correctional facility.  It is well settled that a § 1983 action cannot be based on a theory of respondeat superior.  *See Monell v. New York City Department of Social Services*, 436 U.S. 658, 691 (1978); *Taylor v. Michigan Department of Corrections*, 69 F.3d 76, 80-81 (6th Cir. 1995).

Second, plaintiff attempts to hold Corizon liable for an Eighth Amendment violation based on an unconstitutional policy.  A plaintiff who sues a private or public corporation for constitutional violations under § 1983 must establish that a policy or custom caused the alleged injury.  *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998); *Street v. Corrections Corporation of America*,  102 F.3d 810, 818 (6th Cir. 1996).  Thus, in order to state a § 1983 claim against Corizon, plaintiff must allege the existence of a policy, practice or custom that both violated his Eighth Amendment rights and resulted in an injury.  *See Starcher v. Correctional Medical*

*Systems, Inc.*, 7 Fed. Appx. 459, 465 (6th Cir. 2001) (a prisoner's § 1983 claim against a corporation providing medical services at a state correctional facility must "be premised on some policy that caused a deprivation of [a prisoner's] Eighth Amendment rights"); *Moreno v. Metropolitan General Hospital*, No. 99-5205, 2000 WL 353537 at *2 (6th Cir. March 28, 2000) (in order to state a § 1983 claim against a municipal hospital, plaintiff "must allege the existence of a policy, practice or custom that resulted in the injury"). "It is not enough for a complaint under § 1983 to contain mere conclusory allegations of unconstitutional conduct by persons acting under color of state law. Some factual basis for such claims must be set forth in the pleadings." *Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986). *See Bartalone v. Berrien County*, 643 F. Supp. 574, 578-79 (W.D. Mich. 1986) (a plaintiff in a § 1983 action "must allege sufficient facts to establish the probable existence of the pattern, custom, or policy of which [he] complains.").

To state a § 1983 claim against Corizon, plaintiff's allegations must identify a policy or practice, show that the policymakers made a deliberate choice among various alternatives, and show that the policy caused injury. *See Starcher*, 7 Fed. Appx. at 465. Here, plaintiff did not make any such particularized allegations. Rather, he simply alleged that Corizon "set a policy and custom to save money at any expense even if it calls for a person to suffer pain unnecessarily." Compl. at ¶ 59(f). Plaintiff's allegations are nothing more than "labels and conclusion" which are insufficient to state a cause of action. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). Plaintiff has failed to allege sufficient facts, which, if accepted as true, would state a claim to relief that is plausible on its face against Corizon. *Id.* at 678. Accordingly, Corizon's motion for summary judgment should be granted with respect to plaintiff's Eighth Amendment claim.

### D.    Dr. Burke

### 1.    Plaintiff's medical history

In support of her motion for summary judgment, Dr. Burke filed a 19-page affidavit, which summarized plaintiff's medical history with Dr. Burke and other health care personnel at IBC. *See* Burke Aff. (docket no. 21-1).  The affidavit cites medical records which document at least 63 interactions between plaintiff and health care personnel at IBC.  Given the nature of plaintiff's claims, the Court will review Dr. Burke's affidavit and the relevant medical records.  Dr. Burke noted that in February 2009 (prior to his incarceration), plaintiff had an MRI of his left shoulder, in which "no full-thickness rotator cuff tear was seen."  Burke Aff. at ¶ 5.  Dr. Burke documented some of plaintiff's medical treatment from February 2010 through April 2010 as follows: February 5, 2010 (intake examination showed moderately reduced range of motion and tenderness in plaintiff's left shoulder and plaintiff examination by P.A. Johnson due to complaint of shoulder tenderness) (Burke Aff. at ¶¶ 6-7);  February 9, 2010 (plaintiff received an EKG) (*Id.* at ¶ 8); February 25, 2010 (plaintiff seen by P.A. Johnson mentioning no complaints about his shoulder) (*Id.* at ¶ 9); March 5, 2010 (plaintiff seen by nurse due to right shoulder pain, referred to P.A. Johnson) (*Id.*. at ¶ 10); March 9, 2010 (plaintiff seen by P.A. Johnson for complaints of shoulder pain, given a nonsteroidal anti-inflammatory drug (naproxen) and instructed to follow up in one week if no improvement) (*Id.* at ¶ 11); March 31, 2010 (Nurse Gregurek responded to plaintiff's medical kite regarding shoulder discomfort in which she told him to avoid exercise that would aggravate the shoulder, told him to apply warm and cold compresses to the area, and scheduled him for a visit with a medical provider) (*Id.* at ¶ 12); April 6, 2010 (plaintiff seen by Dr. Holmes complaining of pain in both shoulders, at which time Dr. Holmes gave plaintiff a bottom bunk detail as requested) (*Id.* at ¶ 13); April 12, 2010 (Dr. Burke saw plaintiff to monitor his previously-diagnosed hypertension; upon examination, Dr.

Burke found some tenderness in his right shoulder prescribing naproxen twice a day; the doctor examined plaintiff's left shoulder, noted a full range of motion, with no joint deformity, no heat, no swelling, no erythema, and no effusion) (*Id.* at ¶ 14); and April 27, 2010 (plaintiff saw Dr. Chung complaining of pain in shoulder and depression; plaintiff also requested Elavil, a medication to treat depression, aid sleep and reduce physical pain) (*Id.* at ¶ 15).

      Dr. Burke documented some of plaintiff's medical treatment from May 2010 through December 2010 as follows: May 7, 2010 (Dr. Burke saw plaintiff for his complaint of diarrhea and advised him to stay hydrated and eat small portions; the doctor also examined both shoulders, noting that plaintiff had crepitus in his left shoulder with moderately reduced range of motion and crepitus in his right shoulder with moderate pain with motion; after examination, the doctor gave plaintiff a bottom bunk detail) (Burke Aff. at ¶ 16) [4]; September 27, 2010 (psychiatrist Dr. Chung increased plaintiff's dosage of Elavil due to his complaints of feeling depressed) (*Id.* at ¶ 17); September 28, 2010 (plaintiff seen by a nurse about shoulder pain due to an assault he suffered at a county jail while "out on writ"; plaintiff scheduled to see a medical provider (*Id.* at ¶ 18); October 5, 2010 (plaintiff seen by P.A. Behler for complaints of diarrhea, right shoulder pain and urinary changes; stated that he had been kicked in the right shoulder; plaintiff given exercises for his shoulder and a prescription for naproxen (Naprosyn) (*Id.* at ¶ 19); October 21, 2010 (plaintiff seen for right shoulder pain with restricted range of motion; doctor told plaintiff that he had tendonitis of one of the rotator cuff muscles and was instructed to take pain medication and continue flexibility exercises; he asked for a higher dosage of Elavil which the doctor did not think was medically necessary at the time; advised plaintiff to take Metamucil and to drink 8 glasses of water per day) (*Id.* at ¶ 20); November 22, 2010

---

[4] Dr. Burke defined crepitus as "the cracking, clicking, or popping noise experienced in a joint due to the presence of air in the subcutaneous tissue."  Burke Aff. at ¶ 16.

(plaintiff seen after complaining of pain in the shoulders due to being kicked and punched in May 2010; plaintiff stated his right shoulder hurt worse than left shoulder) (*Id.* at ¶ 21); December 15, 2010 (Dr. Burke saw plaintiff for his right shoulder pain, complaining of limited range of motion in the shoulder due to an assault; doctor ordered an x-ray of his shoulders and increased Elavil dosage (*Id.* at ¶ 22); and, December 17, 2010 (plaintiff's shoulders x-rayed with the left shoulder examined in multiple projections; no conclusive radiographic evidence of fracture, dislocation, osseous or joint pathology in either shoulder; soft tissue appeared normal; "[t]he impression was of a normal left shoulder with an anchor overlying the shoulder from [p]laintiff's previous surgery") (*Id.* at ¶ 23).

Dr. Burke documented some of plaintiff's medical treatment from January 2011 through July 2011 as follows: January 28, 2011 (Dr. Burke saw plaintiff who complained of right shoulder pain, "nerve pain" in his right forearm and being "kicked in the neck"; on examination, the doctor found no muscular atrophy of the shoulders, upper back or arms; while there was a limited decrease in range of motion, there was no tenderness to palpitation in either the right or left shoulder; the doctor increased the Elavil dosage due to plaintiff's complaints of pain (Burke Aff. at ¶ 24); March, 2011 (plaintiff complained of back pain, given a bottom bunk detail and ultimately stated that his back was "much better" (*Id.* at ¶ 25); March 23, 2011 (while seeing mental health personnel, plaintiff did not "demonstrate a large reduction of mobility" in his shoulder) (*Id.* at ¶40); April, 2011 (plaintiff was seen by a medical provider for a urinary problem) (*Id.*); May 22, 2011 (Dr. Burke saw plaintiff per his request, at which time he asked for an MRI; Dr. Burke stated that based on her knowledge, training and experience, an MRI was not indicated and explained to plaintiff that the best course of action was for him to continue physical therapy exercises, which the doctor had demonstrated on previous occasions, and encourage him to use his shoulder "lest he develop adhesive capsulitis"; plaintiff also complained that the Pamelor was ineffective so it was discontinued (*Id.* at

16

¶ 42); June 13, 2011 (plaintiff saw P.A. Behler complaining that he dislocated his left shoulder, apparently referring to a fall in 2009 (before his incarceration)) (*Id.* at ¶ 26); June 14, 2011 (x-ray showed no evidence of acute displaced fracture or other acute osseous abnormalities) (*Id.* citing ID# 274); June 21, 2011 (R.N. Corning responded to plaintiff's kite regarding shoulder pain, advised plaintiff to increase rest periods, purchase pain medication from prisoner store, apply compresses to painful area, and that lifting weights could increase his pain) (Burke Aff. at ¶ 28); June 22, 2011 (plaintiff seen by Dr. Holmes complaining of pain in both shoulders; plaintiff given steroid shot, prescription for motrin and advised to come back in one month) (*Id.* at ¶ 29); July 6, 2011 (plaintiff complained of pain in left shoulder after injection; seen by a nurse who noted normal range of motion in his left hand) (*Id.* at ¶ 30); July 15, 2011 (plaintiff seen in clinic and given motrin for complaints of discomfort) (*Id.*); and, July 20, 2011 (Dr. Burke saw plaintiff and noted that "his explanation for his left arm pain has varied over the course of his incarceration," that she has conducted very thorough musculoskeletal examinations of his shoulders several times over the past year, that plaintiff has osteoarthritis in his left shoulder with crepitus and limited range of motion, that she would look into physical therapy, and that "he needed to move his shoulder to avoid 'frozen shoulder'"; the doctor submitted a request to the PMC for continued Elavil at night which the Committee approved) (*Id.* at ¶ 31)

Dr. Burke documented some of plaintiff's medical treatment from August 2011 through December 2011 as follows: August 4 and 9, 2011 (plaintiff complains that he had "a cervical rib which is pinching a nerve" in his shoulder; this was not substantiated by the x-rays; that plaintiff has arthritis in his shoulder and that while plaintiff "stated that he wanted surgery . . . there were no problems with his shoulder that could be treated surgically") (Burke Aff. at ¶ 32, citing Records (docket no. 24-1 at ID## 56-58)); August 26, 2011 (plaintiff seen by a nurse for pain in his left

shoulder) (Burke Aff. at ¶ 33); September 16, 2011 (plaintiff seen by Dr. Bergman, who noted that plaintiff "refused to do physical therapy and range of motion exercises," that "his previous physical therapy was unhelpful," and that "his recent injection only helped a little"; the doctor gave plaintiff Toradol and plaintiff "agreed at that point to do physical therapy if his pain was relieved"; the doctor found plaintiff's neurovascular aspect distally normal despite the complaints of pain and gave plaintiff a Sigvaris hose to wear on his arm to help with the pain (*Id.* at ¶ 34); September 20, 2011 (plaintiff seen by P.A. Behler due to his complaints on shoulder pain; Behler found no adhesive capsulitis or limited functional range of motion, noting that plaintiff was "only limited by pain") (*Id.* at ¶ 35); October 12, 2011 (medical personnel submitted a request to the PMC on plaintiff's behalf and the PMC authorized Pamelor (a tricyclic antidepressant) (*Id.* at ¶ 36); October 14 and 27, 2011 (plaintiff seen by P.A. Behler, who reviewed plaintiff's medication and found that plaintiff "could move his shoulder in all directions with limited range of motion) (*Id.* at ¶ 37); and, November 30, 2011 (plaintiff seen to check on the effectiveness of Pamelor) (*Id.* at ¶ 38).

Dr. Burke documented some of plaintiff's medical treatment from January 2012 through December 2012 as follows: April 13, 2012 (plaintiff complained about being dizzy and wanted to have blood sugar checked; he was scheduled for an appointment the following week) (Burke Aff. at ¶ 41; Records at ID# 469); June 28, 2012 (plaintiff met with mental health personnel and stated, "[a]ll they gotta do is find the problem and give me a pill;" during the meeting plaintiff "became guarded when Dr. Chung brought up his Polysubstance Dependence") (Burke Aff. at ¶ 43); June 29, 2012 (a clinical progress note by RN Wendt "noted that [plaintiff] was observed walking into the clinic swinging both arms briskly and freely" and that "[o]nce he entered the clinic, he tucked his hand inside his shirt 'like Napoleon' in order to give the appearance of needing to immobilize his left shoulder" (*Id.* at ¶ 44); July 12, 2012 (plaintiff brought in paperwork from his pre-incarceration

18

2009 MRI which "showed a small tear (5 mm) in his rotator cuff"; the doctor stated that "[a]gain, revision of rotator cuff surgery is not medically indicated for [plaintiff]", that he was instructed to follow-up if the pain continued; plaintiff also wanted Elavil (*Id.* at ¶ 45); August 20, 2012 through September 28, 2012 (during this period, plaintiff had at least 8 contacts with healthcare regarding complaints about pain in his shoulder, back, teeth and ankle; he received another x-ray of his shoulder which was normal other than some soft tissue swelling; his request for Elavil was approved; he told mental health personnel "that he believed he was being mistreated because he was not getting the pain medication that he wanted"; and "[h]is chart shows significant substance abuse history of opiates" (*Id.* at ¶ 46; Records at ID## 321-52); October 1, 2012 (plaintiff complained that Elavil was not effective; plaintiff stated that ice helped reduce the pain and was advised to apply an ice pack to his left shoulder three times per day; P.A. Behler noted "that [plaintiff] walked into the clinic with his hand tucked in his shirt, but walked out down the hall swinging both arms normally" (Burke Aff. at ¶ 47); Fall and Winter of 2012 (plaintiff seen at least 6 times; healthcare gave plaintiff steroid shots to help with complaints of pain in the shoulder as well as Mobic; plaintiff complained that his pain persisted after receiving both the shots and Mobic) (*Id.* at ¶ 48; Records at ID## 357-71).[5]

Dr. Burke documented some of plaintiff's medical treatment from January 2013 through November 22, 2013 (the date plaintiff filed this action) as follows: January 23, 2013 (plaintiff saw Dr. Gerlach "who reported that [p]laintiff 'tried to give me an obviously not totally true story about his left shoulder pain'" and that plaintiff "would not give him his MRI"; the doctor gave plaintiff a physical exam noting no atrophy of gross deformity, but as previously found by other

---

[5] While Dr. Burke referred to plaintiff's treatment received in the fall and winter of 2012, the Court notes that some of the treatments actually occurred in the early part of January 2013. *See* Records at ID## 366-71).

doctors, plaintiff had some crepitus with passive range of motion; Dr. Gerlach "noted that [plaintiff] easily took his shirt off and then complained thirty minutes later that he could not lift his arm"; Dr. Gerlach stated "that he doubted that [plaintiff] has serious pathology and suspected that he was complaining for secondary gain unrelated to any actual injury") (Burke Aff. at ¶ 49); July 18, 2013 (plaintiff was seen by a nurse regarding his reports of shoulder pain; the nurse again noted "that she had seen him walking in the yard freely swinging his arms") (*Id.* at ¶ 50); July 2013 (plaintiff made a suicide threat due to his complaints of pain in the *right* shoulder; the psychologist checked with prison officials who described no change in plaintiff's functioning, associations, activities, grooming or demeanor; plaintiff "admitted to threatening suicide to try to get attention for his shoulder"; plaintiff stopped talking about his shoulder pain when the psychologist told plaintiff that he was not able to write prescriptions for pain medication; and the psychologist noted that "[t]he behavioral indicators suggested that [plaintiff] was in no apparent discomfort, his protestations notwithstanding") (*Id.* at ¶ 51); August 2013 through November 2013 (plaintiff seen at least 3 times related to complaints of shoulder pain, in this regard "[t]he notes indicate that [plaintiff] is suspected of malingering) (*Id.* at ¶ 52, Records at ID## 375-80).[6]

Dr. Burke further stated:

[Plaintiff] received thorough and attentive care for his complaints, including his complaints about his shoulders. I gave him multiple thorough physical examinations of his shoulders. Neither surgery nor an MRI is indicated for either of [plaintiff's] shoulders. Based on my multiple physical exams, I found no muscle atrophy and no motor or sensory function deficits that would indicate the need for an MRI or surgical intervention. Physical therapy, including range of motion exercises is the appropriate course of treatment for [plaintiff's] shoulders. [Plaintiff] continues to be regularly evaluated and monitored.

---

[6] Dr. Burke also refers to notes regarding plaintiff's treatments which occurred after he filed this action. *See* Burke Aff. at ¶ 52, Record at ID## 381-87.

*     *     *

It was and continues to be my custom to follow all protocols with patients. While working at MDOC correctional facilities, I provided appropriate medical care to all the inmates I encountered and treated. At no time did I do or fail to do something that presented a substantial medical risk to Howell. I never disregarded [plaintiff's] medical needs or health.

At all times during my care and treatment of [plaintiff], I relied solely on my medical judgment, training, and experience to determine appropriate medical care and how to provide it. At no time did I base my medical care of inmates on anything other than my medical judgment and I was never deliberately indifferent to the patient's medical needs.

Burke Aff. at ¶¶ 53, 55-6 (paragraph numbering omitted).

## 2.    Discussion

Based on this record, plaintiff has not established that Dr. Burke violated the Eighth Amendment by being deliberately indifferent to plaintiff's serious medical needs. The gist of plaintiff's claim is that he disagreed with Dr. Burke's determinations: that he had osteoarthritis; that he received adequate pain treatment (steroid shots, pain medication, exercises, and advice to not aggravate the situation by activities such as weight lifting); that he did not need another MRI; and that he did not need surgery to treat his left shoulder. In addressing Eighth Amendment claims, the Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate  medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976). Here, plaintiff's complaint involves that latter, i.e., that the medical treatment provided did not adequately treat his alleged pain.

There is no question that plaintiff received extensive medical treatment for his condition at the MDOC from 2010 through 2013. Dr. Burke's affidavit indicates that plaintiff had at least 63 interactions with healthcare, many (if not most) of which involved his alleged pain in the

21

left shoulder which was subject to pre-incarceration surgery (although sometimes plaintiff complained of a pain in his right shoulder).  Plaintiff's claim against Dr. Burke involves his disagreement the doctor's medical judgment on how to treat his reported pain in the left shoulder. "[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004), quoting *Westlake*, 537 F.2d at 860 n. 5. "[D]ifferences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis or treatment are not enough to state a deliberate indifference claim." *Ward v. Smith*, No. 95-6666, 1996 WL 627724 at *1 (6th Cir. Oct. 29, 1996).   *See Woodberry v. Simmons*, 146 Fed.Appx. 976, 977 (10th Cir. 2005) ("a difference of opinion between a prisoner and the prison medical staff about medical treatment does not constitute deliberate indifference"); *Owens v. Hutchinson*, 79 Fed. Appx. 159, 161 (6th Cir. 2003) ("[a] patient's disagreement with his physicians over the proper medical treatment alleges no more than a medical malpractice claim, which is a tort actionable in state court, but is not cognizable as a federal constitutional claim"); *Smith v. Marcantonio*, 910 F.2d 500, 502 (8th Cir. 1990) (a prisoner's disagreement with a course of medical treatment does not state a federal constitutional claim); *Wright v. Genovese*, 694 F.Supp.2d 137, 155 (N.D.N.Y. 2010) ("[d]isagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment").

Plaintiff's claim against Dr. Burke involves a disagreement over the medication, diagnostic techniques, and forms of treatment for his complaints of shoulder pain.  Plaintiff's

disagreement with Dr. Burke's medical judgment does not state a federal constitutional claim. Accordingly, Dr. Burke should be granted summary judgment on plaintiff's claims.

> ### D.      Dr. Czop

Plaintiff had limited interaction with Dr. Czop.  Plaintiff alleged that on May 1, 2013, he sent a health care kite stating that his left shoulder was aggravated and needed to see the doctor "A.S.A.P." Compl. at ¶ 47.  On May 14, 2013, Dr. Czop saw  plaintiff, noting that plaintiff was "aware that surgery for this situation is not a treatment option in prison." *Id.* at ¶ 48.  Dr. Czop also informed plaintiff that he would be wasting time trying to get the doctor to do something about his shoulder pain.  *Id.*  Two days later, plaintiff wrote a grievance against Dr. Czop.  *Id.* at ¶ 49.  In his affidavit, Dr. Czop noted that he saw plaintiff on May 14, 2013.  Czop Aff. at ¶ 7 (docket no. 21-3). Dr. Czop stated that prior to seeing plaintiff, he reviewed plaintiff's medical records which included x-ray exams of the shoulder joints and a complete x-ray of the left shoulder.  *Id.* at ¶ 6.  When he examined plaintiff, Dr. Czop found that plaintiff had some limitations in his left shoulder:

> I found that he [plaintiff] had fill range of motion of all his upper extremity joints except for his left shoulder which showed an abduction of about 20 degrees and virtually no external rotation.  I noted no visible atrophy of the left shoulder girdle. There was no scapular winging.

Czop Aff. at ¶ 7.  After finding that plaintiff's right arm was fully functional, Dr. Czop "made a note to continue to monitor [plaintiff] for development of signs of progression in his left arm, such as atrophy or paralysis."  *Id.* at ¶ 8.  Dr. Czop states that plaintiff's present claim, i.e., "that his left shoulder was in pain even at rest" was not consistent with the May 14th examination.  *Id.* at ¶ 9. Based on his review of  plaintiff's medical records and his examination of plaintiff, Dr. Czop stated:

> Based on my medical training, experience and judgment, it was not medically necessary for [plaintiff] to get another MRI or to get surgery on his left shoulder.  In

my opinion, [plaintiff's] condition could be treated through physical therapy and medication.

*Id.* at ¶ 10.

Plaintiff has not established an Eighth Amendment deliberate indifference claim against Dr. Czop.  The gist of plaintiff's claim is that he disagreed with the doctor's determination that plaintiff did not need an MRI or surgery to treat his left shoulder.  As discussed, such a claim does not involve a federal constitutional violation.  *See Graham*, 358 F.3d at 385; *Smith*, 910 F.2d at 502; *Westlake*, 537 F.2d at 860 n. 5; *Woodberry*, 146 Fed.Appx. at 977; *Owens*, 79 Fed. Appx. at 161; *Ward*, 1996 WL 627724 at *1; *Wright*, 694 F.Supp.2d at 155.

### IV.    Plaintiff's state law claims

Finally, plaintiff claims that defendants violated the Michigan Constitution of 1963 and M.C.L. § 691.1407 (i.e., gross negligence).  Compl. at ¶¶ 54-61. The court exercised its supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367, presumably because those claims were intimately related to the alleged § 1983 violation.  *See* 28 U.S.C. § 1367(a) ("the district court shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form a part of the same case or controversy").  The dismissal of plaintiff's federal claims against defendants, however, requires the court to re-examine the issue of supplemental jurisdiction for state law claims against these defendants.  Under 28 U.S.C. § 1367(c)(3), a  district court may decline to exercise supplemental jurisdiction over a claim if the court "has dismissed all claims over which it has original jurisdiction."  Once a court has dismissed a plaintiff's federal claim, the court must determine whether to exercise, or not to exercise, its supplemental jurisdiction under § 1367.  *See Campanella v. Commerce Exchange Bank*, 137 F.3d 885, 892-893 (6th Cir. 1998).  As a general rule

24

"[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point

to dismissing the state law claims." *Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d

1244, 1254-1255 (6th Cir. 1996). Here, with rejection of plaintiff's federal claims, there would be

no sound reason to retain supplemental jurisdiction over plaintiff's state law claims. Accordingly,

the Court should dismiss plaintiff's state law claims asserted against all defendants.

## V.    Recommendation

For the reasons set forth above, I respectfully recommend that defendant R.N.

Corning's motion for summary judgment (docket no. 14) be **GRANTED**.

I further recommend that defendants Dr. Czop, Dr. Burke and Corizon's motion for

summary judgment (docket no. 21) be **GRANTED**.

I further recommend that plaintiff's state law claims against defendants be

**DISMISSED** pursuant to 28 U.S.C. § 1367.

I further recommend that this action be **TERMINATED**.


Dated:  February 9, 2015                      /s/ Hugh W. Brenneman, Jr.
                                              HUGH W. BRENNEMAN, JR.
                                              United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk
of the Court within fourteen (14) days after service of the report. All objections and responses to
objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections
within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474
U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).